IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

THE BOAT COMPANY,                          )
                                           )
                        Plaintiff,         )
                                           )
        and                                )
                                           )
THE FIXED GEAR ALLIANCE,                   )
                                           )
                Intervenor-Plaintiff,      )
                                           )
        vs.                                )
                                           )
PENNY PRITZKER, in her official capacity as )
Secretary of the United States Department of )
Commerce, et al.,                          )
                                           )        No. 3:12-cv-0250-HRH
                        Defendants.        )
_____ )

O R D E R

Cross-Motions for Summary Judgment re The Boat Company's Claims

Plaintiff moves for summary judgment.[1]  This motion is opposed and defendants

cross-move for summary judgment.[2]  Oral argument was requested and has been heard.

_____

[1]Docket No. 35.  <u>Amicus curiae</u> Oceana filed a brief in support of The Boat
Company's motion for summary judgment at Docket No. 43, which the court has
considered.

[2]Docket No. 51.

<u>FACTS/BACKGROUND</u>

<u>The Parties</u>

Plaintiff is The Boat Company, which is a non-profit corporation which operates multi-day tours in southeast Alaska.[3]  Defendants are Penny Pritzker, in her official capacity as Secretary of the United States Department of Commerce; James Basinger, in his official capacity as the Alaska Regional Administrator for the National Marine Fisheries Service; the National Marine Fisheries Service (NMFS);[4] and the National Oceanic and Atmospheric Administration (NOAA).[5]  Defendants manage domestic marine fisheries pursuant to the Magnuson-Stevens Act, primarily through the regulation of commercial fishing.  16 U.S.C. § 1801(b).

<u>The Fishery Management Plan for Groundfish of the Gulf of Alaska</u>

Plaintiff commenced this action to challenge a Final Rule promulgated by defendants which implemented Amendment 76 to the Fishery Management Plan (FMP) for Groundfish of the Gulf of Alaska (GOA).  "The domestic groundfish fishery off Alaska

---

[3]Complaint for Declaratory and Injunctive Relief at 9, ¶ 22, Docket No. 1.

[4]Attached as an appendix to this order is a Table of Acronyms.

[5]NMFS is a sub-agency of NOAA, which is a branch of the Department of Commerce.

is the largest fishery by volume in the U.S."[6]  The groundfish fisheries target pollock, cod, various types of flatfish, sablefish, rockfish, and Atka mackerel.  More than 90% of the annual groundfish catch is taken by trawlers.[7]  Most trawlers are high horsepower vessels between 80 and 150 feet in length that drag huge, conical nets through the water and across the ocean floor.[8]  Fixed-gear vessels take the remainder of the annual catch.  Many of these vessels are shorter than 60 feet and use pots and longlines to catch crab and groundfish.[9]

The GOA Groundfish Fishery is managed by the Northern Pacific Fishery Management Council (referred to herein as "the Council").[10]  The Council developed[11] the

---

[6]Admin. Rec. at REF_0008700, Vol. 4.

[7]Admin. Rec. at REF_0008714, Vol. 4.

[8]Admin. Rec. at REF_00000628-29 & 845-51, Vol. 2B.

[9]Admin. Rec. at RuleFMP_0006941 & 6943, Vol. 8.

[10]The Magnuson-Stevens Act created eight regional fishery management councils, which are quasi-legislative bodies made up of federal, state, and territorial fishery management officials, participants in commercial and recreational fisheries, and other individuals with scientific experience or training in fishery conservation and management. 16 U.S.C. § 1852(a), (b).  The Council is composed of 15 members; 11 voting and 4 non-voting. Seven of the voting members are appointed by the Secretary of Commerce upon the recommendation of the governors of Alaska and Washington.  There are four mandatory voting members, one of whom is the Alaska Regional Director for NMFS.

[11]The Secretary of Commerce, acting through NMFS, reviews FMPs and any amendments thereto that are developed by the Council.  Natural Resources Defense Council, Inc. v. Evans, 316 F.3d 904, 906 (9th Cir. 2003).  If the FMP or amendment is approved, "the Secretary publishes notice of the FMP or amendment in the Federal Register and promulgates regulations implementing the plan after a 60–day statutory
(continued...)

GOA Groundfish FMP[12] which was implemented on December 1, 1978 and which has been amended multiple times.

FMPs must address fifteen mandatory statutory criteria, including conservation, catch limits, vessel types, data collection, bycatch reduction, economic impacts, and fish habitat protection. 16 U.S.C. § 1853(a). FMPs may also address any of thirteen discretionary criteria. 16 U.S.C. § 1853(b). "Any fishery management plan prepared, and any regulation promulgated to implement any such plan" must also "be consistent with" the Magnuson-Stevens Act's ten "national standards for fishery conservation and management[.]" 16 U.S.C. § 1851(a). Of import here is National Standard 9, which was added to the Magnuson-Stevens Act in 1996 when Congress enacted the Sustainable Fisheries Act, Pub. L. No. 104-297, 110 Stat. 3559 (1996).

National Standard 9 provides that "[c]onservation and management measures shall, to the extent practicable, (A) minimize bycatch and (B) to the extent bycatch cannot be avoided, minimize the mortality of such bycatch." 16 U.S.C. § 1851(a)(9). Bycatch is "fish

---

[11](...continued)
comment period."Id.

[12]The Secretary of Commerce, acting through NMFS, reviews FMPs and any amendments thereto that are developed by the Council. Natural Resources Defense Council, Inc. v. Evans, 316 F.3d 904, 906 (9th Cir. 2003). If the FMP or amendment is approved, "the Secretary publishes notice of the FMP or amendment in the Federal Register and promulgates regulations implementing the plan after a 60–day statutory comment period." Id.

which are harvested in a fishery, but which are not sold or kept for personal use, and includes economic discards and regulatory discards." 16 U.S.C. § 1802(2). "Bycatch can, in two ways, impede efforts to protect marine ecosystems and achieve sustainable fisheries and the full benefits they can provide to the Nation." 50 C.F.R. § 600.350(b).

> First, bycatch can increase substantially the uncertainty concerning total fishing-related mortality, which makes it more difficult to assess the status of stocks, to set the appropriate OY [optimum yield] and define overfishing levels, and to ensure that OYs are attained and overfishing levels are not exceeded. Second, bycatch may also preclude other more productive uses of fishery resources.

Id. The Fisheries Act also required that the Secretary, "in conjunction with eight regional councils, ... 'establish a standardized reporting methodology to assess the amount and type of bycatch' in each fishery in each region." Oceana, Inc. v. Locke, 670 F.3d 1238, 1239 (C.A.D.C. 2011) (quoting 16 U.S.C. § 1853(a)(11)). "The councils then use the reports to develop policies to minimize bycatch and bycatch mortality."[13] Id.

---

[13]"For the BSAI and GOA fisheries as a whole, the annual discard rate for groundfish [was] 7.0% in 2004," which was approximately 39.6 million pounds. Admin. Rec. at REF_0008210 & 0008230, Vol. 4. Trawlers are responsible for almost all Chinook salmon bycatch, Admin. Rec. at REF_0007202, Vol. 3, and in 2010, the Council "determined that levels of Chinook salmon PSC [prohibited species catch] in the pollock trawl fisheries in the GOA ... were unacceptably high...." Admin. Rec. at REF_0012547, Vol. 6. Trawlers are also responsible for most of the halibut bycatch in the GOA. 77 Fed. Reg. 15,194, 15,210 (March 14, 2012). Halibut bycatch in the GOA is approximately 2,000 metric tons per year. Admin. Rec. at REF_539-40, Vol. 2B & REF_8748, Vol. 4.

"Bycatch in the ... GOA groundfish fish[ery] is estimated through the Catch Accounting System (CAS)...."[14] The CAS is the NMFS Alaska Region's standardized bycatch reporting methodology."[15]

In addition to the general requirements for an FMP, Section 313 of the Magnuson-Stevens Act provides that the Council

> may prepare ... a fisheries research plan for any fishery under the Council's jurisdiction except a salmon fishery which ...
>
> (1) requires that observers be stationed on fishing vessels engaged in the catching, taking, or harvesting of fish and on United States fish processors fishing for or processing species under the jurisdiction of the Council, including the Northern Pacific halibut fishery, for the purpose of collecting data necessary for the conservation, management, and scientific understanding of any fisheries under the Council's jurisdiction;[16] and
>
> (2) establishes a system ... of fees, which may vary by fishery, management area, or observer coverage level, to pay for the cost of implementing the plan.

16 U.S.C. § 1862(a).

Any FMP or amendment prepared pursuant to Section 313

> shall be reasonably calculated to--

---

[14]Admin. Rec. at RuleFMP_0004828, Vol. 7.

[15]Id.

[16]On-board observers collect biological data such as species composition, fish weights and lengths, marine mammal and seabird interactions, and tissue samples.

(A) gather reliable data, by stationing observers on all or a statistically reliable sample of the fishing vessels and United States fish processors included in the plan, necessary for the conservation, management, and scientific understanding of the fisheries covered by the plan;

(B) be fair and equitable to all vessels and processors;

(C) be consistent with applicable provisions of law; and

(D) take into consideration the operating requirements of the fisheries and the safety of observers and fishermen.

16 U.S.C. § 1862(b). Any system of fees that the Council develops to pay for the observer program must "be expressed as a fixed amount reflecting actual observer costs ... or a percentage, not to exceed 2 percent, of the unprocessed ex-vessel value of fish and shellfish harvested under the jurisdiction of the Council, including the Northern Pacific halibut fishery[.]" 16 U.S.C. § 1862(b)(2)(E).

After the Council amends an FMP containing an observer program, it is forwarded to the Secretary, who, acting through NMFS, then has 60 days to

review such plan or plan amendment and either (A) remand such plan or plan amendment to the Council with comments if it does not meet the requirements of this section, or (B) publish in the Federal Register proposed regulations for implementing such plan or plan amendment.

16 U.S.C. § 1862(c)(1). Any proposed amendment is then subject to a 60-day comment period, during which time, "public hearing[s] in each State represented on the Council" must be held "for the purpose of receiving public comments on the proposed regulations."

16 U.S.C. § 1862(c)(2). "Within 45 days of the close of the public comment period, the Secretary, in consultation with the Council, shall analyze the public comment received and publish final regulations for implementing such plan." 16 U.S.C. § 1862(c)(3).

The 1990 Observer Program

In 1989, pursuant to Section 313 of the Magnuson-Stevens Act, the Secretary authorized the first human observer program for the GOA Groundfish fishery by approving Amendment 18 to the GOA Groundfish FMP.[17] The observer program was then implemented by NMFS in 1990.[18] The "1990 Observer Plan based coverage levels on vessel length and processing volume for catcher vessels and processors of BSAI and GOA groundfish fisheries."[19] "Under the plan, groundfish vessels under 60′ length overall (LOA) [were] not required to carry observers; groundfish vessels longer than 60′ but shorter than 125′ [were] required to carry observers 30% of their fishing time; and groundfish vessels 125′ and longer [were] required to carry observers 100% of their fishing time."[20] "The original coverage requirements were changed to reduce coverage from 100%

_____

[17]Admin. Rec. at RuleFMP_0006915, Vol. 8.

[18]Id.

[19]Id.

[20]Id.

to 30% for vessels ≥ 125′ using pot gear to fish groundfish."[21] "Shoreside processors that process[ed] 1,000 mt [metric tons] or more of groundfish in a calendar month [were] required to have observers 100% of the days that they receive[d] or process[ed] groundfish."[22] "[V]essels fishing for halibut ... [were] exempt from observer coverage."[23] In sum, the 1990 Observer Program divided the GOA groundfish fleet into three categories: 1) no coverage, 2) partial coverage, and 3) full coverage.

The 1990 Observer Program required that "vessels and processors ... arrange for observer services from an observer provider certified by NMFS."[24] This was referred to as the "pay-as-you-go" system.[25] The "pay-as-you-go" system was intended to be an interim system that would be replaced with a fee-based program under which "NMFS would contract directly for observer services, thereby eliminating the potential for conflict of interest generated by the direct contractual arrangement between the industry and the observer providers, and establishing arrangements under which observer companies

---

[21]Id.

[22]Id.

[23]Admin. Rec. at RuleFMP_0004822, Vol. 7.

[24]Admin Rec. at RuleFMP_0006915, Vol. 8.

[25]Admin. Rec. at REF_0009517, Vol. 4.

would be directly accountable to NMFS for data quality."[26]  The "pay-as-you-go" system,

however, remained in effect until the Final Rule being challenged here was promulgated.

Restructure of the Observer Program

In December 2008, the Council voted to restructure the Observer Program.  The

following problem statement was approved by the Council:

> The North Pacific Groundfish Observer Program (Observer
> Program) is widely recognized as a successful and essential
> program for management of the North Pacific groundfish
> fisheries.  However, the Observer Program faces a number of
> longstanding problems that result primarily from its current
> structure.  The existing program design is driven by coverage
> levels based on vessel size that, for the most part, have been
> established in regulation since 1990 and do not include
> observer requirements for either the <60′ groundfish sector or
> the commercial halibut sector.  The quality and utility of
> observer data suffer because coverage levels and deployment
> patterns cannot be effectively tailored to respond to current
> and future management needs and circumstances of individual
> fisheries.  In addition, the existing program does not allow
> fishery managers to control when and where observers are
> deployed.  This results in potential sources of bias that could
> jeopardize the statistical reliability of catch and bycatch data.
> The current program is also one in which many smaller vessels
> face observer costs that are disproportionately high relative to
> their gross earnings.  Furthermore, the complicated and rigid
> coverage rules have led to observer availability and coverage
> compliance problems.  The current funding mechanism and
> program structure do not provide the flexibility to solve many
> of these problems, nor do they allow the program to effectively

---

[26]Id.  When the observer program was established in 1990, the Magnuson-Stevens
Act did not permit the collection of fees to pay for observer costs.

respond to revolving and dynamic fisheries management objectives.[27]

The Council developed five possible alternatives for restructuring the Observer Program. Alternative 1 was the status quo alternative and the other four alternatives restructured the Observer Program. "The four restructuring alternatives [were] distinguished primarily by which fisheries or sectors would be included in the restructured program and the structure of the fee mechanism used."[28] In June 2010, "[t]wo options were ... added ... which [were] applicable under any of the action alternatives...."[29]

On October 8, 2010, the Council adopted Alternative 3 with a modified version of Option 2 as its preferred alternative.[30] Under Alternative 3, "[a]ll vessels and processors in the groundfish and halibut fisheries off Alaska would be placed into one of two observer coverage categories."[31] These two categories were 1) "the 'greater than or equal to 100% ($\geq$ 100%) coverage category" and 2) "the 'less than 100 percent' (<100%) coverage category."[32] "Vessels and processors in the $\geq$100% coverage category would not be

---

[27]Admin. Rec. at RuleFMP_0006900, Vol. 8.

[28]Admin. Rec. at RuleFMP_0006925, Vol. 8.

[29]Admin. Rec. at NPFMC_0001076, Vol. 1.

[30]Admin. Rec. at RuleFMP_0006886, Vol. 7.

[31]Id.

[32]Id.

included under the ex-vessel fee-based program and would continue to obtain observers by contracting directly with observer providers ('status quo')."[33] "Observer coverage for vessels and processors in the <100% category would be managed under an ex-vessel fee based observer service delivery model...."[34] "The fee percentage would be set in regulation at 1.25% of the ex-vessel value of groundfish and halibut."[35] "The selection of vessels and processors that must carry an observer under the restructured program would be determined through a sampling and deployment plan. Observer coverage rates (trips or vessels) would not be in regulation."[36] Rather, "NMFS will release an observer report by September 1 of each year. The report will contain the proposed stratum and coverage rates for the deployment of observers in the following calendar year[.]"[37] "NMFS also would prepare an annual report on the observer program for presentation to the Council each year.... As part of this annual report, the 1.25% fee percentage would be reviewed by the

---

[33]Id.

[34]Id.

[35]Id.

[36]Id.

[37]Admin. Rec. at RuleFMP_006888, Vol. 7.

Council after completion of the second year of observer deployment in the restructured program."[38]

After the Council adopted its preferred alternative, NMFS prepared a draft Environment Assessment/Regulatory Impact Review/Initial Regulatory Flexibility Analysis (the EA). The EA was prepared, in part, to satisfy the requirements of the National Environmental Policy Act (NEPA). NEPA "requires federal agencies to consider the environmental impact of 'major Federal actions significantly affecting the quality of the human environment.'" Oceana, Inc. v. Locke, 831 F. Supp. 2d 95, 101 (D.D.C. 2011) (quoting 42 U.S.C. § 4332(C)). "Under NEPA, an agency planning an action may use an Environmental Assessment ("EA") to determine whether the proposed action ... would have a significant environmental impact." Alaska v. Lubchenco, 723 F.3d 1043, 1048 (9th Cir. 2013). An EA is a concise public document that briefly describes the proposal, examines alternatives, considers environmental impacts, and provides a list of individuals and agencies consulted. 40 C.F.R. § 1508.9. "If the agency concludes there is no significant effect associated with the proposed project, it may issue a FONSI [finding of no significant impact] in lieu of preparing an EIS [environmental impact statement]." Envtl. Protection Information Ctr. v. U.S. Forest Srvc., 451 F.3d 1005, 1009 (9th Cir. 2006).

---

[38]Id.

The EA prepared by NMFS in this case "examine[d] the environmental and economic effects of ... Amendment 76 [to] the Fishery Management Plan for Groundfish of the Gulf of Alaska to change the service delivery model for the ... Observer Program[].....[39] In the EA, NMFS considered the economic and socioeconomic effects of the preferred Alternative 3 and explained that

> the 1.25% fee was determined by balancing the need for revenue to support the observer program with the need to minimize impacts on the industry sectors included in the restructured program. A 1.25% fee was estimated to generate about $4.2 million, based on the mean estimate of average 2005 - 2008 revenues, and fund over 9,000 observer days. The amount of revenue needed to support the proposed performance standard (P2 coverage levels) of 30% observer coverage is estimated as $3.8 million, which would fund 8,093 observer days. ... Thus, the Council determined that a 1.25% fee would fund the necessary observer days to reach the target performance standard, with a small buffer equal to roughly 10% of the estimated revenue....[40]

More specifically, in the EA, NMFS estimated that the 1.25% ex-vessel value fee would generate approximately $4.2 million, which was sufficient revenue to fund 9,027 days of observer coverage,[41] "[a]ssuming that an observer day costs $467[.]"[42]

---

[39]Admin. Rec. at RuleFMP_0006521, Vol. 7.

[40]Admin. Rec. at RuleFMP_0006639, Vol. 7.

[41]Admin. Rec. at RuleFMP_0006746, Vol. 7.

[42]Admin. Rec. at RuleFMP_0006645, Vol. 7.

On December 1, 2011, which was after the EA had been prepared, NMFS became aware that the $467 observer day cost had increased. NMFS learned that, based on more recent estimates, the cost of an observer day was now $872.[43]

On March 14, 2012, the Council published a scope notice, in which it advised that the proposed Amendment 76 had been submitted to NMFS for review.[44] The notice explained that Amendment 76

> add[s] a funding and deployment system for observer coverage to the existing North Pacific Groundfish Observer Program ... and amend[s] existing observer coverage requirements for vessels and processing plants at 50 CFR 679.50. The new funding and deployment system would allow NMFS to determine when and where to deploy observers according to management and conservation needs, with funds provided through a system of fees based on the ex-vessel value of groundfish and halibut in fisheries covered by the new system. This action is necessary to resolve data quality and cost equity concerns with the Observer Program's existing funding and deployment structure.[[45]]

The Notice provided for a 60-day comment period and NMFS held three public hearings on the proposed changes.

---

[43]Admin. Rec. at Email_0022838, Vol. 1.

[44]Admin. Rec. at RuleFMP_0005892, Vol. 7.

[45]Admin. Rec. at RuleFMP_0005892, Vol. 7.

On April 18, 2012, the Secretary published the proposed rule.[46]   The Executive

Summary of the proposed rule explained that the Observer Program would be divided

> into two observer coverage categories–partial and full....  The
> partial observer coverage category would include fishing
> sectors (vessels and processors) that would not be required to
> have an observer at all times and the full observer coverage
> category would include fishing sectors required to have all of
> their operations observed.[47]

The proposed rule "retain[ed] the existing funding and deployment system for operations

in the full coverage category.  Vessels and processors in the partial coverage category

would pay to NMFS an observer fee based upon the ex-vessel value of fish landed ... for

their observer coverage[.]"[48]  "An observer fee equal to 1.25 percent of the fishery ex-vessel

value would be assessed on partial coverage category participants to fund their observer

coverage...."[49]   The Executive Summary for the proposed rule explained the annual

deployment process (ADP), stating that

> NMFS would release a completed report by September 1 of
> each year.  The annual report would contain detailed informa-
> tion on the financial aspects of the program and the annual
> deployment plan–the proposed stratum and coverage rates for
> the deployment of observers in the following calendar year.

---

[46]Admin. Rec. at RuleFMP_0006286, Vol. 7.

[47]Admin. Rec. at RuleFMP_0006287, Vol. 7.

[48]Id.

[49]Id.

Prior to September, the Council may request its Observer Advisory Committee, Groundfish Plan Teams, or Scientific and Statistical Committee to review and comment on a draft of the annual report.[50]

"The Council would not formally approve or disapprove the annual report, including the deployment plan, but NMFS would consult with the Council on the annual report to provide an opportunity for Council input."[51]

On June 1, 2012, NMFS issued an FONSI because it "determined that Amendment[] ... 76 will not significantly impact the quality of the human environment....  In addition, all beneficial and adverse impacts of the proposed action have been addressed to reach the conclusion of no significant impacts.  Accordingly, preparation of an EIS for this action is not necessary."[52]

The Draft 2013 ADP

In October 2012, NMFS published a draft 2013 Annual Deployment Plan (ADP).[53] The draft ADP used data from 2011 as a proxy to determine observer coverage rates for 2013.  Using this data, the draft ADP achieved an observer coverage rate for 2013 of 13%

---

[50]Admin. Rec. at RuleFMP_0006304, Vol. 7.

[51]Admin. Rec. at RuleFMP_0006305, Vol. 7.

[52]Admin. Rec. at RuleFMP_0006282, Vol. 7.

[53]Admin. Rec. at ADP_0000434, Vol. 1.

for the partial coverage fleet.[54]  The data showed that in 2011, 147 vessels in the partial

coverage fleet of 187 vessels were observed and those vessels harvested 53,888.46 metric

tons of groundfish on observed days.[55]  The draft ADP called for 345 vessels out of 787

vessels in the restructured partial coverage fleet to be observed and it was estimated that

they would harvest 30,917.43 metric tons of groundfish on observer days.[56]

The Final Rule

On November 21, 2012, the Final Rule was published.[57]  The Executive Summary

explained that the Final Rule

> will reduce bias in observer data, authorize the collection of
> observer data in sectors that do not currently have any
> observer coverage requirements, allow fishery managers to
> provide observer coverage to respond to the management
> needs and circumstances of individual fisheries, and assess a
> broad-based fee which reflects the value a vessel or processor
> extracts from the fishery.
>     First this final action expands the Observer Program to
> include groundfish vessels less than 60 ft. LOA and halibut
> vessels that have not been previously required to carry an
> observer.

---

[54]Admin. Rec. at ADP_0000456, Vol. 1.  In September 2012, NMFS contracted for
approximately 4,500 observer days at a cost of $4.4 million.  Admin. Rec. at Email_0008553,
Vol. 1.

[55]Admin. Rec. at ADP_0000456, Vol. 1.

[56]Id.

[57]Admin. Rec. at RuleFMP_0004822, Vol. 7.

Second, this final action restructures the observer deployment system by establishing two observer coverage categories: Partial and full. All groundfish and halibut vessels and processors will be included in one of these two categories.[58]

The Final Rule is codified primarily at Title 50, Part 679, of the Code of Federal Regulations. Section 679.51(d) provides that owners of vessels and processors in the full coverage category still "must arrange and pay for required observer coverage from a permitted observer provider." 50 C.F.R. § 679.51(d)(1). In other words, "the [F]inal [R]ule does not change the observer deployment or funding system for operations in the full coverage category."[59] But, the Final Rule does redefine the full coverage category to include "catcher/processors, motherships, and catcher vessels participating in a catch share program with a transferable prohibited species catch [PSC} ... limit."[60]

"The partial observer coverage category includes fishing sectors ... that will not be required to have an observer at all times."[61] "The partial coverage category includes catcher vessels, shoreside processors, and stationary floating processors when not

---

[58]Admin. Rec. at RuleFMP_0004823, Vol. 7.

[59]Id.

[60]Id.

[61]Id.

participating in a catch share program with a transferable PSC limit."[62]  Vessels and processors included in this category "will pay a fee ... to NMFS to fund the deployment of observers" and NMFS will "contract[] with observer providers and determine[] when and where observers are deployed, based on a scientifically sound sampling design."[63]

The Final Rule divides the partial coverage group into two selection pools: a "vessel selection" pool and a "trip selection" pool.  50 C.F.R. § 679.51(a)(1)(C) & (D).  The "vessel selection" pool consists of "[v]essels fishing hook-and-line and pot gear between 40 and 57.5 feet in length overall...."[64]  Observer coverage is assigned to vessels in this pool at random if a vessel is selected.  "NMFS w[ill] randomly choose a subset of vessels ... to observe for a predetermined time period.[65]  "[T]he time period for which a selected vessel would be required to carry an observer would be specified in the annual deployment plan[.]"[66]

The "trip selection" pool includes all remaining vessels in the partial coverage category.  "Initially, trips taken by hook-and-line and pot vessels 57.5 feet LOA or greater and all trawl vessels in the partial coverage category w[ill] comprise the trip selection pool.

---

[62]Id.

[63]Id.

[64]Admin. Rec. at ADP_0000440, Vol. 1.

[65]Admin. Rec. at RuleFMP_0006293, Vol. 7.

[66]Id.

NMFS w[ill] further subdivide the trip selection pool into groups with similar traits (sampling strata) and assign a specific sampling rate to each stratum to minimize the variance, and thus increase certainty, in observer-derived catch estimates."[67] Observer coverage in this pool is on a trip-by-trip basis.[68] Vessels in the "trip selection" pool register their planned fishing trips and NMFS randomly assigns observers to trips.[69]

The ADP process was described in the preamble to the Final Rule:

> The annual deployment plan will describe the sampling design NMFS uses to generate unbiased estimates of total and retained catch, and catch composition in the groundfish and halibut fisheries. The annual deployment plan also will describe how NMFS will deploy observers to shoreside processing plants or stationary floating processors in the partial coverage category. Adjustments to the annual deployment plan would be made each year after a scientific evaluation of data collected under the restructured Observer Program to evaluate the impact of changes in observer deployment and identify areas where improvements are needed to collect the data necessary to conserve and manage the groundfish and halibut fisheries.[70]

---

[67]Admin. Rec. at RuleFMP_0006292, Vol. 7.

[68]Id.

[69]Id.

[70]Admin. Rec. at RuleFMP_0004823, Vol. 7.

NMFS explained that "[t]he annual deployment plan process provides flexibility to adjust scientific sampling methods from one year to the next as new information is acquired and management needs change."[71]

One of the public comments NMFS addressed when the Final Rule was promulgated was that the "rule[] and the analysis are not consistent with the requirements of section 303(a)(11) of the MSA that the FMPs establish a standardized bycatch reporting methodology."[72] NMFS replied that the SBRM "is unaffected by this action and is outside the scope of this rulemaking" but that the Final Rule will "improve NMFS' ability to estimate bycatch, strengthen the standardized bycatch reporting methodology, and support the intent of section 303(a)(11) of the MSA."[73]

The Final 2013 ADP

In January 2013, NMFS issued the final 2013 ADP, in which NMFS

made the following changes to the 2013 Draft ADP (Chapter 2):

1.  NMFS increased the anticipated coverage rate for the trip selection pool and decreased the anticipated coverage rate for the vessel selection pool. The vessel selection pool is anticipated to have a deployment rate of approximately 11%, although deviations from the rate [are] expected

---

[71]Admin. Rec. at RuleFMP_0004826, Vol. 7.

[72]Admin. Rec. at RuleFMP_0004828, Vol. 7.

[73]Id.

due to differences in fishing effort between the 2011 landing information used in the simulations and what will be realized in 2013. The rest of the available coverage days will be placed into the trip selection pool. NMFS anticipates that the coverage rate in the trip selection pool will be between 14-15%.

2. NMFS changed the deployment period for vessels in the vessel selection pool to 2-months, rather than 3-months.... A 2-month selection period conforms more closely to fishery openings than quarterly durations of coverage and will improve data collection for the vessel selection pool.[74]

In January 2013, NMFS also issued a Supplementary Information Report (SIR) for the 2103 ADP which "analyz[ed] the information contained in the 2013 ADP to determine whether the EA should be supplemented."[75] The SIR noted that "[t]he 2013 ADP used some information that was not available for the EA analysis."[76]

Specifically, the ADP uses the federal start-up funds of $4.48 million ... as the amount of funding available for deploying observers in 2013. In future years, the funds available for observer coverage will be the amount collected from the fees. The 2013 ADP uses the observer cost estimates from the confidential contract information, the available federal funds, and the 2011 number of vessel days at-sea as a proxy for the anticipated 2013 vessel days at-sea, to estimate the total

[74]Admin. Rec. at ADP_0000031-32, Vol. 1.

[75]Admin. Rec. at ADP_0000020, Vol. 1.

[76]Admin. Rec. at ADP_0000021, Vo1. 1.

coverage rate of 13 percent for the partial coverage category....[77]

The SIR further noted that

this type of new information was anticipated in the design of the new Observer Program and the ADP process is a flexible process designed to adjust to new information. The preferred Observer Program analyzed in the EA anticipated that NMFS would use the best available information on funding, costs, and vessel days at-sea in the ADP for the upcoming year. The EA explains that the cost of observer coverage and the amount of funding available for observer coverage would change over time. The EA recognized that the coverage rate for any given year would be dependent on available revenue and anticipated costs and vessel days at-sea. The analysis recognized annual changes in revenue and costs were inherent in the program and therefore established the ADP process to ensure that the best available information was used to deploy observers each year.[78]

NMFS concluded that this new information about the cost of an observer day did "not indicate that there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts. Therefore, supplemental NEPA documentation is not necessary to implement the 2013 ADP."[79]

---

[77]Admin. Rec. at ADP_0000021-22, Vol. 1.

[78]Admin. Rec. at ADP_0000022, Vol. 1.

[79]Admin. Rec. at ADP_0000023, Vol. 1.

<u>This Litigation</u>

The Boat Company commenced this action on December 21, 2012, and on December 26, 2012, filed a first amended complaint. The Boat Company's primary contention is that the Final Rule does not provide adequate means to monitor bycatch in the GOA Groundfish Fishery.

In its first and second claims for relief, The Boat Company asserts that defendants violated the Magnuson-Stevens Act and the APA because the CAS is an inadequate SBRM and because defendants failed to consider the standards for SBRMs when they adopted the Final Rule.[80] In its third, fourth, and fifth claims for relief, the Boat Company asserts that defendants violated the Magnuson-Stevens Act, the APA, and NEPA because the restructured Observer Program failed to achieve NMFS's 30% observer coverage performance standard because of the increased cost for an observer day.[81] In its sixth claim for relief, The Boat Company alleges that it was arbitrary and capricious under NEPA and the APA for NMFS to not supplement the EA when the proposed observer coverage levels changed from 30% to 13%.[82] In its seventh claim for relief, The Boat Company alleges that

---

[80]Complaint for Declaratory and Injunctive Relief at 23-24, ¶¶ 74-83, Docket No. 1.

[81]<u>Id.</u> at 25-27, ¶¶ 84-95.

[82]<u>Id.</u> at 27-28, ¶¶ 96-100.

NMFS violated NEPA by not preparing an EIS.[83]  And, in its eighth claim for relief, The Boat Company alleges an APA claim based on allegations that it was arbitrary and capricious for NMFS to publish the 2013 ADP prior to the Final Rule being promulgated.[84] The Boat Company requests that the court declare that "the Final Rule and the ADP violated the Magnuson-Stevens Act and the APA and that the EA/FONSI violated NEPA and the APA" and that the court "[r]emand the Final Rule and the EA/FONSI to [NMFS] to develop a standardized bycatch reporting methodology, an adequate funding mechanism for the observer program, and a NEPA analysis that complies with the court's order."[85]

## STANDARD OF REVIEW

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "In reviewing an administrative agency decision, 'summary judgment is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did.'"  City & County of San Francisco v. United States, 130 F.3d 873, 877 (9th Cir. 1997) (quoting Occidental Eng'g Co. v. INS, 753 F.2d 766, 770 (9th Cir. 1985)).

---

[83] Id. at 28, ¶¶ 101-103.

[84] Id. at 28-29, ¶¶ 104-107.

[85] Id. at 29.

"'[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'" Id. (quoting Occidental Eng'g Co., 753 F.2d at 769).

"Under section 305(f) of the Magnuson-Stevens Act, 16 U.S.C. § 1855(f), which adopts the standard of review set forth in the APA at 5 U.S.C. § 706, regulations promulgated by the Commerce Secretary may be set aside only if they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Midwater Trawlers Cooperative v. Dep't of Commerce, 393 F.3d 994, 1002 (9th Cir. 2004) (quoting 5 U.S.C. § 706(2)(A)). "'The arbitrary and capricious standard is narrow, and [the court] may not substitute [its] judgment for that of the agency.'" Id. (quoting Washington v. Daley, 173 F.3d 1158, 1169 (9th Cir. 1999)). "Rather, in reviewing such regulations, [the court's] only task is to determine whether the Secretary 'has considered the relevant factors and articulated a rational connection between the facts found and the choices made.'" Id. at 1002-03 (quoting Daley, 173 F.3d. at 1069). "A regulation will be found to be arbitrary and capricious 'if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" Southeastern Fisheries Ass'n, Inc. v. Mosbacher, 773 F. Supp. 435, 439 (D.D.C.

1991) (quoting Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Auto. Ins. Co., 463 U.S. 29, 43 (1983)). "The court conducts [its] review with due deference to the Secretary's expertise in making fishery conservation and management policy decisions and will only set aside the Secretary's actions if the administrative record indicates [s]he has acted in derogation of h[er] Congressionally delegated authority." Connecticut v. Daley, 53 F. Supp. 2d 147, 158 (D. Conn. 1999). "[I]n conducting this review, the court looks to the National Standards for Fishery Conservation Management, established by Congress and set forth at 16 U.S.C. § 1851(a), as a guide for determining whether the Secretary exercised h[er] authority rationally and consistently within the parameters set by Congress." Id.

The court also "review[s] substantive agency decisions concerning NEPA under the 'arbitrary and capricious' standard of the Administrative Procedure Act[.]" Assoc. of Public Agency Customers, Inc. v. Bonneville Power Admin., 126 F.3d 1158, 1183 (9th Cir. 1997) (quoting 5 U.S.C. § 706(2)(A)). The court's "task 'is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious.'" Id. (quoting Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc., 462 U.S. 87, 97–98 (1983)). "Alternatively phrased, the task is to ensure that the agency has taken a 'hard look' at the potential environmental consequences of the proposed action." Klamath-Siskiyou Wildlands Center v. Bureau of Land Mgmt., 387 F.3d 989, 993 (9th Cir. 2004).

DISCUSSION

NEPA Standing

Defendants argue that The Boat Company lacks prudential standing to bring its NEPA claims.  In an APA case such as this, "in addition to demonstrating constitutional standing, a plaintiff 'must assert an interest arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'"  Wild Fish Conservancy v. Jewell, 730 F.3d 791, 796 (9th Cir. 2013) (quoting Nev. Land Action Ass'n v. U.S. Forest Serv., 8 F.3d 713, 716 (9th Cir. 1993)).  "The purpose of this prudential standing requirement is 'to exclude those plaintiffs whose suits are more likely to frustrate rather than to further statutory objectives.'"  Id. at 797 (quoting Nev. Land Action Ass'n, 8 F.3d at 716).  "NEPA … is directed at environmental concerns[.]"  Ashley Creek Phosphate Co. v. Norton, 420 F.3d 934, 939 (9th Cir. 2005).  Purely economic or financial concerns do not fall within NEPA's zone of interest.  Id. at 940.

Defendants argue that while The Boat Company describes itself as a non-profit with a "charitable mission to protect and conserve southeast Alaska's natural resources, in particular its fisheries,"[86] its actual interest in this litigation is purely economic in nature.  For example, The Boat Company's chairman of the board avers that its "economic interests are directly injured when there are reductions in the allowable recreational catch of fish

---

[86]Declaration of Mike McIntosh [etc.] at 2, ¶ 2, Docket No. 37.

populations that" The Boat Company "targets" on its charter fishing trips.[87]  He also avers

that NMFS "does not have a handle on the true level of removals of halibut from its trawl

fisheries and the true extent to which those removals are responsible for significant

downstream economic losses."[88]  He further avers that the

> restructured observer program carries a substantial risk of
> immediate and severe harm to the business, charitable, and
> conservation interests of The Boat Company.  The Service's
> deficient observer program harms our sport fishing business,
> causes us to divert resources to advocating for adequate
> bycatch monitoring and improving fish stocks, and frustrates
> our broader mission of sustaining marine resources for all
> Alaskans and particularly southeast Alaska's coastal fishing
> communities.[[89]]

Joel Hanson, who is a captain for The Boat Company, avers that

> The Boat Company is being negatively affected by the observer
> program restructuring because the decision impairs the ability
> of NMFS to collect the bycatch data necessary to manage its
> fisheries and to develop bycatch control measures necessary to
> ensure the availability of halibut and chinook to The Boat
> Company's clients and other resource users.  This in turn will
> cause economic harm to The Boat Company because customer
> satisfaction is linked to successful halibut and chinook catches
> and to good referrals and strong bookings.[[90]]

---

[87]Id. at 10, ¶ 30.

[88]Id. at 14, ¶ 39.

[89]Id. at 14-15, ¶ 42.

[90]Declaration of Captain Joel Hanson [etc.] at 8, ¶ 20, Docket No. 38.

"A plaintiff can, however, have standing under NEPA even if his or her interest is primarily economic, as long as he or she also alleges an environmental interest or economic injuries that are 'causally related to an act within NEPA's embrace.'" Ranchers Cattlemen Action Legal Fund United Stockgrowers of Amer. v. U.S. Dep't of Agric., 415 F.3d 1078, 1103 (9th Cir. 2005) (quoting Port of Astoria, Or. v. Hodel, 595 F.2d 467, 476 (9th Cir. 1979)). While The Boat Company's interest here is basically economic, it has also alleged an environmental interest. The Boat Company alleges that its "'mission is to assist and support in protecting the natural environment of Southeast Alaska by engaging in and sponsoring charitable, educational and scientific programs aimed at natural resource conservation.'"[91] The Boat Company also alleges that it is a not-for-profit company that "reinvests all residual income beyond general overhead operating expenses back into conservation, education, and other programs...."[92] These allegations are sufficient to give The Boat Company prudential standing under NEPA.

The NEPA Claims

The Boat Company contends that defendants violated NEPA because NMFS, when preparing the EA, relied on a flawed cost assumption as to the cost of an observer day and

---

[91]Supplemental Declaration of Mike McIntosh at 2, ¶ 3 (quoting The Boat Company's Restated Articles of Incorporation), Exhibit 1, Plaintiff The Boat Company's Reply in Support of Motion for Summary Judgment and Opposition to Defendants' Motion for Summary Judgment, Docket No. 67.

[92]Id. at 2, ¶ 4.

also failed to consider the possibility of a substantial reduction in the observer coverage rate under the Council's preferred alternative, a reduction that would greatly impact defendants' ability to manage bycatch. At the very least, The Boat Company contends that NMFS should have prepared a supplemental EA when it became aware that the cost of an observer day had significantly increased.

As stated in the EA, "[t]he mission of the observer program is to provide the highest quality data to promote stewardship of the North Pacific living marine resources for the benefit of the Nation."[93] "This goal is supported by objectives that include "[p]rovid[ing] accurate and precise catch, bycatch, and biological information for conservation and management of groundfish resources and the protection of marine mammals, seabirds, and protected species."[94] Yet, in the EA, NMFS did not consider whether it would still be getting high quality data if observer costs significantly increased and observer coverage substantially decreased as a result. In the January 2013 SIR, NMFS acknowledges that

> while the EA did not analyze the environmental impacts of specific coverage rates, it did analyze the probable environmental impacts of using a scientifically-based sampling design to deploy observers, collecting observer data in sectors that have never had any observer coverage requirements, and allowing fishery managers to provide observer coverage to

---

[93] Admin. Rec. at RuleFMP_0006921, Vol. 8.

[94] Id.

respond to the management needs and circumstances of individual fisheries....[95]

It is well and good that NMFS and the Council used scientific-based sampling to design the plan for deploying observers and that the Council and NMFS resolved some of the defects with the 1990 Observer Program by adding coverage for vessels in the fleet that had not previously carried observers and by allowing fishery managers flexibility in deploying observers. But that does not mean that there is no problem here. What NMFS failed to do was analyze the environmental impacts of specific observer coverage rates. While flexibility in management is desirable, NMFS and the Council had to consider what would happen to the quality of the data being gathered if observer coverage rates significantly decreased from those projected or assumed in the EA. NMFS could not ignore the fact that if costs of the observer program doubled without an offsetting change in the ex-vessel value fee, the quantity of data being collected would decrease, and that this decrease could lead to a reduction in the quality of the data being collected. At some point, coverage rates will drop too low to generate quality data, but the EA is silent as to when this might occur.

The risk presented by the restructured Observer Program arises because, as NMFS recognized, revenues generated in one year are employed to fund the program for the following year, and those revenues may increase or decrease. Additionally, and as NMFS also recognized, the costs of the Observer Program could (and did) increase from one year

---

[95]Admin. Rec. at ADP_000022, Vol. 1.

to the next. The restructured Observer Program may be sufficiently robust that it could survive one or both of increased costs and decreased revenues. But, the EA prepared by NMFS did not consider that risk. NMFS did not consider whether the restructured Observer Program would still yield reliable, high quality data given likely variations in costs and revenues.

That the ADP process was intended to deal with these likely variations does not resolve the problem. By the time the Final 2013 ADP was issued, NMFS knew that the cost of an observer day had almost doubled and that the observer coverage rate for the partial coverage fleet had dropped from the 30% projected in the EA to approximately 13%. Yet, NMFS determined that it was not necessary to supplement the EA in order to implement the 2013 ADP. This was arbitrary and capricious. The new observer cost information was significant new information that required further NEPA analysis. When confronted with a significant increase in costs and a substantial decrease in observer coverage, NMFS was required to take a hard look at the effect that these changes would have on the reliability of the data collected, which it did not do.

In sum, the EA prepared by NMFS was inadequate because it failed to address the risk to data quality that may result from increased observer costs and decreased observer coverage. Nowhere in the EA does NMFS discuss the rate at which observer coverage would be too low to generate high quality, reliable data. NMFS also acted arbitrarily and

capriciously by not supplementing the EA when it knew that the cost of an observer day had substantially increased and the rate of observer coverage for the partial coverage fleet had significantly decreased.[96]

Magnuson-Stevens Act Reduced Observer Coverage Claim

The Boat Company argues that NMFS acted arbitrarily and capriciously because observer coverage under the Final Rule was substantially reduced from the status quo, a reduction that will affect the statistical reliability of the observer data collected, particularly bycatch data. The Boat Company argues that the record indicates that NMFS recognized that for observer data to be statistically reliable, it must be collected at a coverage rate of no less than 30%; yet, NMFS then adopted a Final Rule that provided for less than half that much coverage.

Before the Final Rule was promulgated, NMFS knew that the cost of observers had approximately doubled and NMFS had to know that this would mean that observer

_____

[96]The Boat Company also argued that it was arbitrary and capricious for NMFS to issue a FONSI, rather than preparing an EIS, because the proposed action had a significant effect on the human environment. "[I]f there is uncertainty over whether [a] proposed project may have a significant impact, including uncertainty caused by ... an inadequate EA, the court should ordinarily remand for the agency to either prepare a revised EA or reconsider whether an EIS is required." Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin., 538 F.3d 1172, 1179 (9th Cir. 2008). The court leaves it to the agency to reconsider, once an adequate EA has been prepared, whether an EIS will be required.

coverage for the partial coverage fleet would be significantly reduced. Section 313 of the

Magnuson-Stevens Act requires that the Observer Program

> be reasonably calculated to--
>
> (A) gather reliable data, by stationing observers on all or a statistically reliable sample of the fishing vessels and United States fish processors included in the plan....

16 U.S.C. § 1862(b)(1). There is no indication in the administrative record that NMFS or the

Council considered whether they would get reliable data at coverage levels below 30%.

If the quality of the data being collected ceases to be reliable, then the Observer Program

does not comply with Section 313 of the Magnuson-Stevens Act.

The court is mindful that defendants contend that NMFS never adopted a 30%

requirement for observer coverage and thus any argument that the Final Rule was arbitrary

and capricious because it did not achieve 30% observer coverage fails. Defendants contend

that in developing the restructured Observer Program, NMFS considered the inflexible

standard in the existing program which required that the partial coverage fleet carry

observers 30% of the time and discerned, based on published literature, that "the [observer]

coverage required for any ... performance standard varies widely between the species, in

a fishery, with common species requiring less coverage than rare species."[97]  The literature

also revealed that the observer coverage levels necessary to reach certain performance

---

[97]Admin. Rec. at RuleFMP_0006709, Vol. 7.

standards varied widely from study to study, even with respect to the same species.[98]

Defendants contend that NMFS and the Council, having considered the available scientific information, reasonably decided against setting a specific across-the-board coverage level, in part because there was no prior data available from either vessels under 60' LOA or the halibut fleet.[99]   Defendants insist that the available data did not permit NMFS to definitively link observer coverage rates to statistical performance standards.

Defendants also dispute that the EA states that a 30% coverage rate is the "minimum standard" for observer coverage.   The portion of the EA which refers to the 30% minimum standard was discussing a deployment formula called "P2" in which defendants contend fishery managers choose a given minimum coverage standard, for example 30%, and the system[100] works backwards from there to determine the number of observer days required.[101]   Defendants contend that the Council did not choose the P2 deployment formula, but rather chose the P1 deployment formula, under which fishery managers begin

---

[98]Id.

[99]Admin. Rec. at RuleFMP_0006716-17, Vol. 7.

[100]The "system" is presumably some kind of computer software that can run calculations.

[101]Admin. Rec. at RuleFMP_0007092, Vol. 8.

with a fixed budget amount and the system uses that amount to determine the number of observer days.[102]

Contrary to defendants' contention, the Council appears to have adopted the P2 deployment formula, which was based on the 30% coverage rate, as part of its preferred alternative. The EA, in discussing why the Council chose the 1.25% ex-vessel value fee, states that "[t]he amount of revenue needed to support the proposed performance standard (P2 coverage levels) of 30% observer coverage is estimated at $3.8 million[.]"[103] This seems to indicate that the Council had selected a 30% performance standard, at least in the context of determining what the ex-vessel value fee should be.

That said, whether the Council and NMFS selected a 30% performance standard really makes little difference. The restructured Observer Program has costs and generates revenue. These costs and revenues are going to fluctuate. The Final Rule fixed the ex-vessel value fee at a rate that was projected to fund 30% coverage for the partial coverage fleet, but in developing the Final Rule, as discussed above, NMFS and the Council did not address the question of how much (or how little) coverage is necessary to obtain reliable data. Defendants may be correct that there is no evidence that statistically reliable data is achieved with a 30% performance standard and the restructured Observer Program clearly

---

[102]Id.

[103]Admin. Rec. at RuleFMP_0007018, Vol. 8.

addressed some of the defects with the 1990 Observer Program. But, that does not necessarily mean that the restructured Observer Program will generate statistically reliable data at all cost/revenue levels. NMFS and the Council were not required to fix an observer coverage rate for the partial coverage fleet, but NMFS and the Council were required by the Magnuson-Stevens Act to develop an observer program that was reasonably calculated to gather reliable data. It is not possible to determine whether the restructured Observer Program does so because, as discussed above, NMFS and the Council never considered what minimum level of coverage was necessary to ensure that the data being collected was reliable.

The  CAS/SBRM Claims

The Boat Company argues that defendants violated the Magnuson-Stevens Act and the APA because the CAS, which The Boat Company contends was first adopted as the SBRM for the GOA Groundfish Fishery in the Final Rule, is not an adequate SBRM. This argument fails because the CAS was not first adopted as the SBRM in the Final Rule, but rather was added to the GOA Groundfish FMP via rulemaking that concluded on October 6, 2010. See 75 Fed. Reg. 61,639. Any challenges to the adequacy of the CAS would have had to have been brought within 30 days of that rulemaking.

The Boat Company also contends that defendants were required to consider the standards for SBRMs when the Final Rule was adopted because the CAS and the Observer

Program are deeply interrelated. The CAS "is described in Section 3.2.4.2 of ... the GOA FMP."[104] The subsections to Section 3.2.4 of the GOA FMP "describe some of the accountability measures in place for the GOA groundfish fishery."[105] Accountability measures ensure that overfishing does not occur in the fishery.[106] Subsection 3.2.4.1 describes the Observer Program and Subsection 3.2.4.2. describes the CAS. The CAS is described as follows:

> Each year, accounts are established in the Alaska Catch Accounting System (CAS) that match[] the categories listed in the annual harvest specification tables. A combination of observer data, dealer landing reports, and at-sea production reports are used to provide an integrated source for fisheries monitoring and in-season decision making. The purposes of the CAS are to: manage the groundfish fishery, establish accounts that match the annual harvest specification tables, allow catch reporting from multiple data sources without duplication, debit reported catch from the appropriate account, and estimate prohibited species catch and at-sea discards.[[107]]

---

[104]Admin. Rec. at RuleFMP_0004828, Vol. 7.

[105]Admin. Rec. at NPFMC_0003640, Vol. 2A.

[106]Id.

[107]Admin. Rec. at NPFMC_0003641, Vol. 2A.

The Boat Company argues that because the CAS relies heavily on observer data,[108] the SBRM for the GOA Groundfish Fishery should be understood to be a combination of the CAS <u>and</u> the Observer Program. The Boat Company points out that even NMFS has stated that "[t]he at-sea observer program has been a critical element of the bycatch management regime for the Alaska groundfish fisheries for almost 30 years." 68 Fed. Reg. 11,501, 11,510 (Mar. 11, 2003). Thus, The Boat Company argues that, contrary to NMFS's contention that the Final Rule had no impact on the SBRM for the GOA Groundfish fishery, the Final Rule must meet the Magnuson-Stevens Act's standards for SBRMs, which it does not do.

The CAS and the Observer Program are plainly related. The latter feeds into the former. The Observer Program provides data for the SBRM, but the CAS is the actual methodology that NMFS uses to assess bycatch in the GOA Groundfish Fishery. The Boat Company does not appear to take issue with the reporting methodology itself or even with the reporting requirements that are set forth in 50 C.F.R. § 679.5.[109] Rather, the crux of The Boat Company's challenge to the Final Rule concerns the substance of the restructured

---

[108]<u>See</u> Admin. Rec. at REF_0006418, Vol. 2B ("[m]ore than half of the estimates of retained catch and groundfish discarded at sea are derived exclusively from observer data" and "[e]stimates of at-sea discard of prohibited species catch (PSC) are based either entirely on observer data, or if observer data are not available for a specific trip, on at-sea discard rates from observer data that are applied to industry reports of retained catch").

[109]These reporting requirements were largely unaffected by the Final Rule. The Final Rule only revised paragraph (1)(7)(i) of the Section 679.5.

Observer Program. The Boat Company's legitimate concern is with the validity of the bycatch data that is gathered and not with how the data is analyzed. That concern has been addressed above in connection with The Boat Company's claims regarding reduced observer coverage. Nonetheless, the court will briefly address The Boat Company's arguments that the Final Rule failed to meet the standards for SBRMs.

The Boat Company first argues that the Final Rule fails to meet the standards for SBRMs because it illegally gives NMFS total discretion to allocate observer resources each year by deferring critical observer deployment decisions to the ADP process. This argument fails because the observer allocation method established by the Final Rule is rational, supported by the record, and not impermissibly discretionary. The Final Rule establishes two observer categories (full and partial) and sub-categories (trip selection and vessel selection) and explains which vessels fall within each. The fact that specific assignment probabilities within these fixed categories and strata may fluctuate from year to year based on real-time data does not make the allocation system arbitrarily discretionary. Rather, this system will allow NMFS to "evaluate the impact of changes in observer deployment and identify areas where improvements are needed to collect the data necessary to conserve and manage the groundfish and halibut fisheries."[110] This will help

---

[110] Admin. Rec. at RuleFMP_0004823, Vol. 7.

NMFS obtain "the best available scientific information...."[111]  In short, while the Final Rule

gives NMFS some discretion as to the deployment of observers in the partial coverage fleet,

it does not give NMFS unfettered discretion.  Although NMFS does get to decide when and

where observers are deployed within the partial coverage fleet, it does so "based on a

scientifically sound sampling design."[112]

The Boat Company next argues that the Final Rule fails to comply with the

standards for SBRMs because it improperly ties observer deployment to a funding

mechanism rather than a deliberate and rational determination of observer needs.  But, a

linkage between funding and observer coverage is in fact contemplated by Section 313 of

the Magnuson-Stevens Act.  Section 313 authorizes the Council to "establish[] a system ...

of fees, which may vary by fishery, management area, or observer coverage level, to pay

for the cost of implementing the plan." 16 U.S.C. § 1862(a)(2).  Section 313 further provides

that

> [a]ny system of fees established ... shall ... be expressed as a
> fixed amount reflecting actual observer costs as described in
> subparagraph (A) or a percentage, not to exceed 2 percent, of
> the unprocessed ex-vessel value of fish and shellfish harvested
> under the jurisdiction of the Council, including the Northern
> Pacific halibut fishery.

---

[111]Admin. Rec. at RuleFMP_0004826, Vol. 7.

[112]Admin. Rec. at RuleFMP_0004823, Vol. 7.

Id. § 1862(b)(2)(E).  Thus, it was not improper for defendants to link observer coverage to a fee system.

The Boat Company also argues that the Final Rule does not comply with the standards for SBRMs because it fails to establish a prioritization process for observer deployment if there are funding constraints.  But, the problem with the restructured Observer Program is not so much of a revenue shortfall, but the potential for a decrease in observer coverage, which in turn will affect the quality, or statistical reliability, of the data being collected.  That problem has been discussed above and it is the problem that defendants will have to confront on remand.

Finally, The Boat Company argues that the Final Rule fails to comply with the standards for SBRMs because NMFS failed to undertake an analysis of bycatch reporting needs by specific gear types and bycatch species.  The Boat Company contends that NMFS ignored the national bycatch guidance which provides that "[a]n optimum allocation scheme would entail identification of strata within which high variability in bycatch occurs and placing additional sampling effort in these strata to minimize the variance for a specified funding level."[113]

The Boat Company's assertion that NMFS did not consider specific observer coverage needs by gear type or bycatch species is incorrect.  The Final Rule divides vessels

_____

[113]Admin. Rec. at ADP_0009739-9740, Vol. 4.

into full and partial coverage categories based on gear type and the partial coverage category is further divided into the vessel selection pool and the trip selection pool. The trip selection pool is comprised mainly of trawl vessels and the vessel selection pool is comprised mainly of hook-and-line vessels. Vessels in the trip selection pool have a higher probability of being selected compared to vessels in the vessel selection pool, in order to increase coverage in fisheries that have prohibited species catch limits.[114] The type of sub-stratification that The Boat Company is urging is known as "probabilities proportional to size", which NMFS did consider. In the 2013 ADP, NMFS noted that

> [i]t may seem intuitive to adjust the probability of observer coverage to reflect the relative size of the fleet, either in terms of effort (trip length, vessel size) or impact to the marine resources.... However in studies that have compared catch estimates resulting from sampling with probabilities proportional to size (PPS) to those obtained through equal probability sampling (as proposed here), it has been found that equal probability sampling was preferable given the relatively marginal estimation benefits (if any) and greater logistical complexities that arise from implementing PPS....[115]

The analytic problem with The Boat Company's preferred approach arises whether probability of observer assignment is varied by gear or by species:

> if the population of ... a special species is large, and encounter rates by fishers is common, then the bycatch amounts obtained from observers deployed with equal probability sampling will

---

[114]Admin. Rec. at ADP_000031-32, Vol. 1.

[115]Admin. Rec. at ADP_000043, Vol. 1.

> be unbiased and sampling will be robust enough to capture
> such events without compromising the catch estimates of
> other, more abundant species. If however, the bycatch rates for
> a special species are low, and/or fishing encounters infrequent,
> then it is possible that a sample may not capture the rare event
> or if the event is captured, the variance in the resulting catch
> estimate may be high.[116]

NMFS reasonably concluded that the presently available data does not permit scientists to

know which of these situations will occur.[117]

## RELIEF

Defendants violated NEPA and the Magnuson-Stevens Act by failing to consider the

point at which the observer coverage rate becomes too low to generate reliable, high

quality data. Thus, the court must determine what relief is appropriate. "A flawed rule

need not be vacated." Calif. Communities Against Toxics v. U.S. E.P.A., 688 F.3d 989, 992

(9th Cir. 2012). "Vacatur is a species of equitable relief." Sierra Forest Legacy v. Sherman,

951 F. Supp. 2d 1100, 1105 (E.D. Cal. 2013).

> "Although the district court has power to do so, it is not
> required to set aside every unlawful agency action. The court's
> decision to grant or deny injunctive or declaratory relief under
> the APA is controlled by principles of equity."

Id. (quoting Nat'l Wildlife Fed'n v. Espy, 45 F.3d 1337, 1343 (9th Cir. 1995) (emphasis

omitted)). "It is well established in this Circuit that a [c]ourt is not mechanically obligated

---

[116]Id.

[117]Id.

to vacate an agency decision that it finds invalid." Id. at 1105-06 (citing Humane Soc'y v. Locke, 626 F.3d 1040, 1053 n.7 (9th Cir. 2010) ("stating that a court may remand without vacatur to allow the agency action to remain in force until the action can be considered or replaced"); Pit River Tribe v. U.S. Forest Serv., 615 F.3d 1069, 1080–81 (9th Cir. 2010) ("Our courts have long held that relief for a NEPA violation is subject to equity principles."); Idaho Farm Bureau Fed'n v. Babbitt, 58 F.3d 1392, 1405 (9th Cir. 1995) ("[W]hen equity demands, the regulation can be left in place while the agency follows the necessary procedures."); W. Oil and Gas Ass'n v. EPA, 633 F.2d 803, 813 (9th Cir. 1980) ("[G]uided by authorities that recognize that a reviewing court has discretion to shape an equitable remedy, we leave the challenged designations in effect."). "Nothing in the Administrative Procedure Act, which provides the basis for review of the" restructured Observer Program, "restricts the range of equitable remedies available to the [c]ourt, including the issuance of declaratory relief without setting aside the agency action." Id. at 1106.

Here, vacature is neither necessary nor appropriate. Fishing for groundfish within the GOA will go on, and this fishing must be observed, in part to address the serious problem of bycatch. The Final Rule has been demonstrated to incorporate significant improvements with respect to how observers are deployed, and those improvements should be allowed to stand. However, the problem with the reliability of data as it relates to increased observer costs and decreased observer coverage must be addressed. Thus, the

appropriate remedy here is a remand for preparation of a supplemental EA. NMFS must prepare a supplemental EA that addresses the question of when data being gathered by the restructured Observer Program ceases to be reliable, or of high quality, because the rate of observer coverage is too low.

CONCLUSION

The motions for summary judgment as to The Boat Company's claims[118] are granted in part and denied in part. Summary judgment is granted in favor of The Boat Company on its claims that defendants violated the Magnuson-Stevens Act, NEPA, and the APA by failing to consider whether the data collected by observers would still be reliable in the face of significant observer cost increases. Summary judgment is granted in favor of the defendants on all of The Boat Company's other claims. Defendants' motion to strike[119] is also granted.

This matter is remanded to defendants to prepare a supplemental environmental assessment consistent with this order and the law.

DATED at Anchorage, Alaska, this <u>6th</u> day of August, 2014.

/s/ H. Russel Holland
United States District Judge

---

[118]Docket Nos. 35 & 51.

[119]Docket No. 49.

# TABLE OF ACRONYMS

ADP   Annual Deployment Plan
APA   Administrative Procedure Act
BSAI   Bering Sea and Aleutian Islands
CAS   Catch Accounting System
EA   Environmental Assessment
EIS   Environmental Impact Statement
FMP   Fishery Management Plan
FONSI   Finding of No Significant Impact
GOA   Gulf of Alaska
LOA   Length Overall
MSA   Magnuson-Stevens Act
NEPA   National Environmental Policy Act
NOAA   National Oceanic and Atmospheric Administration
NMFS   National Marine Fisheries Service
OY   Optimum Yield
PPS   probabilities proportional to size
PSC   Prohibited Species Catch
SBRM   Standardized Bycatch Reporting Methodology
SIR   Supplementary Information Report
SSC   Statistical and Scientific Committee for the Council
TAC   Total Allowable Catch
TBC   The Boat Company